NEW YORK GRAPE SUGAR CO. *v.* BUFFALO GRAPE SUGAR CO. and
others.

SAME *v.* AMERICAN GRAPE SUGAR CO. and others.

*(Circuit Court, N. D. New York.   July 23, 1885.)*

1. PATENTS FOR INVENTIONS—LACHES OF PATENTEE—RIGHT OF VENDEE TO RE-
COVER DAMAGES.
    The patentee's previous laches and indifference in regard to the use of his
    patents by defendant corporation *held* sufficient to prevent the enforcement by
    a court of equity of the pecuniary claims of his vendee against it for infringe-
    ments before the purchase of the patent. .
2. SAME—INFRINGEMENT BY CORPORATION—PURCHASE BY FORMER DIRECTORS—
RIGHT OF ASSIGNEE TO DAMAGES.
    When the executive officers and managers of a corporation that has been
    infringing a patent, having sold their stock, purchase the patent, their as-
    signee will not be allowed in equity to make the corporation pay the profits
    created by their own acts of infringement.

In Equity.

*Dickerson & Dickerson,* for plaintiffs.

*John R. Bennett* and *Sherman S. Rogers,* for defendants.

SHIPMAN, J.   This is a motion to amend the interlocutory decrees
in the entitled causes, so as to provide for an accounting of the profits
and an assessment of the damages which accrued upon patents 65,-
664, 81,883, and 137,911, prior to the plaintiffs' purchase thereof.
The facts in the cases are stated at length in the published opinions
in 18 FED. REP. 638, and 20 FED. REP. 505.   Upon these facts two
questions arise:

1. Are the claims against the Buffalo Grape Sugar Company, which
Joseph J. Gilbert assigned, through Messrs. Phillip and Morgan, to the
Messrs. Jebb, for the profits and damages which had accrued upon the
infringement of his patents Nos. 65,664 and 81,883, such as should
be enforced by a court of equity in this suit, commenced in 1881?

The position of the defendants is that if Mr. Gilbert had brought
against the Buffalo Company a bill for an injunction and an account,
instead of making the assignment, he would have been successfully
met, so far as the accounting of profits and damages before the com-
mencement of the suit was concerned, by the principle that "laches and
neglect are always discountenanced" by a court of equity.   It is urged
by the plaintiff that, assuming it to be true as found by the court, that
the entire patented process was not used until 1878–79, there was
but a brief period during which Gilbert could have been chargeable
with laches.   If this was the entire case, the defendants' position
would be exceedingly weak.   The facts are that in 1868 Fox & Will-
iams were using the machinery described in the Gilbert patent of
1867, and his process, up to and including the deposit upon the tables.
Fermenich & Williams were also using the same part of the process.

Each of those firms were sued by J. J. Gilbert for infringement. Probably just before the institution of the suit against Fox & Williams they were offered by Colgate Gilbert a license to use the patents then in existence for $10,000, which was refused. The suits were subsequently voluntarily discontinued. One of the reasons for the discontinuance, which was given by Colgate Gilbert to one of the witnesses, and the one which was found by me to be the reason for the subsequent inaction of J. J. Gilbert, was because Fox & Williams were syrup manufacturers, and were not substantially interfering with the business of the Gilberts. From that time Fox & Williams and their successor, the Buffalo Company, continued to use the Gilbert machinery, and, commencing in 1878–79, it used the entire process. The American Company, which was formed in 1877, also used the same machinery and process during the management of the Jebbs, and before the sale of their stock in May, 1879. No subsequent objection was ever made by J. J. Gilbert to any acts of either of said companies, or to any act of any other manufacturer, although there were various other infringers between 1868 and his death. His whole conduct showed an indifference as to the infringement, and led the infringers to believe that his patents were not valid or important. The great bulk of the business, in which the entire process was used, was undoubtedly the manufacture of glucose, a business which, during the time of the infringement, was immense, and which the patentee did not wish to stop. It is true that he did not know that either company was using the entire process, and he did not care to know. He had an "easy indifference" on the subject. But it is said that he did not know that either company was using his process in the laundry-starch business, and that, if he had known, he would have been aggressive and positive in his efforts to suppress infringement. He must have known that each company was making laundry starch, and he knew that the Buffalo Company had used his machinery and a part of his process in the manufacture of glucose, and that his predecessor had refused to take a license. If he had cared to investigate and see whether this competitor was now infringing upon his rights, it would not have been difficult for him to ascertain. On the contrary, he was content to use his patented process in his own mill, and was apparently indifferent whether the Buffalo Company used it or not, though with very good reasons to believe that it was an infringer.

I am strongly of opinion that, as against the Buffalo Company, J. J. Gilbert would have had no standing in an attempt to obtain the aid of a court of equity to recover these old claims. As against the American Company, he would have been in a better position; for, while he knew that it, like the other company, was making glucose to a very large extent, there is no positive evidence that his attention was ever particularly called to its machinery, or that he knew that it had ever used his inventions in whole or in part. If, however, he had, in 1881, asked for an injunction against the Buffalo Company's fur-

ther use of his patents, it would have seemed to me unjust that he should also be permitted to obtain an account of the profits and an assessment of the damages which were the result of the very extensive business, which he did not wish to stop, and which grew out of the use of patents to which he apparently had had no objection since the discontinuance of the suits commenced in 1868.

There are no decisions which relate to a similar state of facts. In *McLean* v. *Fleming*, 96 U. S. 246, there was a knowledge of the plaintiff's predecessors of the defendant's use of their trade-mark for, perhaps, 20 years. In *Merriam* v. *Smith*, 11 FED. REP. 588, the infringers, who were both manufacturers, were wholly unaware of the existence of the patent which they infringed, and which was intended for the manufacture of welts for carriage trimmings. The patentees were equally ignorant of the infringing machine. In that case, while Judge LOWELL left the purchasers of the claims for past damages to their action at law, the question of laches on the part of the patentees did not, apparently, arise. I therefore place the decision of this branch of the case upon the general principle that the patentee's previous laches and indifference in regard to the use of his patents by the Buffalo Company, will prevent the enforcement by a court of equity of his pecuniary claims against that company for infringements before the purchase of the patents by the present owner and plaintiff.

2. Are the claims against the American Grape Sugar Company for the infringement of the J. J. Gilbert patents, and also of No. 137,911, which were assigned to the plaintiff by the Messrs. Jebb, such as a court of equity will enforce?

The works of this company were erected under the personal management and direction of the Messrs. Jebb, both of whom were directors, and one was vice-president and the other was treasurer of the company, and both were afterwards actively engaged, as its officers and managers, in this infringement. Subsequently, having sold their stock in the company for $80,000, they bought these patents, and now are seeking, through their assignee, to make the company pay the profits which were created by their own acts of infringement. As the active managers of the company, they committed or authorized the infringement, and, having obtained title to the patents which they infringed, brought a suit to compel the company to pay for their own unlawful acts. That suit was subsequently converted into the present one by stipulation. An enforcement of such a claim does not seem to me to be the province of a court of equity. It is not claimed that an accounting shall be had for the time during which the patents were owned by the Messrs. Jebb.

The defendants presented affidavits upon which they asked that, in case the motion was granted, it should be upon condition that the case should be opened so as to permit them to present newly-discovered evidence that the invention described in the patent of 1867

was in public use, with the consent of the patentee, in the year 1861. The affidavits state the declaration of a third person in regard to what he had ascertained could be proved by other persons, and also his declarations as to the effect of these discoveries upon the suit against the Duryeas. I think that the truth of the declarations of the third person is not sufficiently manifest to justify me in opening cases so carefully prepared as these were.

The plaintiff's motion is denied, except as to an accounting of the profits and an assessment of damages for the use of No. 137,911 by the Buffalo Grape Sugar Company before its purchase by the Messrs. Jebb.