## TOMPKINS v. ST. REGIS PAPER CO.

(Circuit Court of Appeals, Second Circuit. July 1, 1916.)

### No. 279.

**1. PATENTS ⟨⟩280—SUIT FOR INFRINGEMENT—EQUITY JURISDICTION.**
Where suit for infringement is brought upon a patent which has expired, a court of equity ordinarily has no jurisdiction; but there may be special circumstances which give it jurisdiction, as where the facts alleged show that complainant has sustained no damages which could be recovered at law and his only remedy is by a suit to obtain an accounting for profits.
[Ed. Note.—For other cases, see Patents, Cent. Dig. § 439; Dec. Dig. ⟨⟩280.]

**2. PATENTS ⟨⟩289—SUIT FOR INFRINGEMENT—LACHES.**
A suit for infringement by an assignee of a patent may be barred by the laches of his assignor, which has the same effect as his own.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. ⟨⟩289.]

**3. PATENTS ⟨⟩289—SUIT FOR INFRINGEMENT—LACHES.**
Acquiescence and laches, however long, on the part of a patentee, may be excused by satisfactory proof that he had no knowledge or means of knowledge that his patent was being infringed, but poverty alone is not a sufficient excuse for delay in asserting his rights.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. ⟨⟩289.]

**4. PATENTS ⟨⟩289—SUIT FOR INFRINGEMENT—LACHES.**
Delay in prosecuting other infringers while the validity of a patent is in active litigation does not constitute laches.
[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. ⟨⟩289.]

**5. PATENTS ⟨⟩328—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING PAPER STOCK.**
The Tompkins patent, No. 458,135, for a process of making paper pulp, in view of the prior art, and especially of patent No. 340,640 to the same patentee, is void for lack of patentable novelty; also, *held* not infringed.

Appeal from the District Court of the United States for the Northern District of New York.

Suit in equity by John D. Tompkins against the St. Regis Paper Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 226 Fed. 744.

The defendant is a corporation organized and existing under the laws of the state of New York, and it has its principal office and regular place of business at Watertown, in the county of Jefferson and state of New York.

The complainant is a citizen of the United States and a resident of the state of New York. He alleges that he was the first and sole inventor of cer-

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tain new and useful improvements in the process of making paper pulp, and that United States patent No. 458,135 was issued to him therefor, dated August 18, 1891.

The complainant alleges that the defendant has infringed the patent above referred to, and he asks an injunction and that defendant may be decreed to account for and pay over the gains and profits realized by the defendant, and in addition the damages or treble the amount of the damages as the court may determine.

The court below, in a carefully prepared and exhaustive opinion of 28 printed pages, dismissed the bill on the ground that the patent sued upon was anticipated in the prior art, and particularly by letters patent No. 340,640 granted to the complainant on April 27, 1886, and also upon the ground that even if letters patent No. 458,135 had been valid the complainant had not infringed. From that decree this appeal was taken.

A. Page Smith, of Albany, N. Y. (Edwin J. Prindle, of New York City, of counsel), for appellant.

W. K. Richardson, of New York City (W. B. Van Allen, of New York City, on the brief), for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The art to which the invention of the patent in suit relates is that of so treating fibrous vegetable substances as to prepare them to be made into paper. The raw materials used in the manufacture of paper comprise wood pulp, rags, straw, hemp, flax, jute, and so forth. From these materials come the cellulose fibers, matted or felted into a sheet, of which paper consists. It is necessary to free the cellulose fibers from all incrusting matter from which they must be isolated and set free. This is accomplished by cooking the raw materials with chemicals. The patent in suit relates to the art or process of treating fibrous and other kindred materials for their conversion into paper stock.

The patentee has been a manufacturer of a wrapping paper made from straw. There is testimony in the record showing that at one time he stood at the head of the manufacturers of straw wrapping paper. His paper was sold from New York to San Francisco, and he was esteemed "a sort of peer in the business."

Wrapping paper made from straw was of coarse texture and inferior in strength as compared with manila and wood pulp papers which began to displace it and prices commenced to decline. The patentee's mill was so situated that he could not advantageously get wood pulp, and he began to experiment to see if he could not improve the quality of his straw product.

There appear to have been three principal ways of cooking paper stock. One way has been by the soda process, used for soft woods. By that process wood is run through a chipping machine reducing it to chips three-eighths of an inch thick; the chips are put into a boiler-iron digester and boiled with caustic soda liquor. This leaves the fiber free, the noncellulose matters of the wood being decomposed by or combined with the soda.

Another way has been by the sulphite process. Under this process wood chips are boiled in a steel digester containing a solution of bisulphite of lime or bisulphite of calcium. The bisulphite solution is

made by passing sulphurous acid gas up through towers filled with limestone and at the same time water is trickled through the limestone.

Another way has been by the sulphate process. This consists in boiling wood chips in a digester under pressure in a solution of sodium sulphate containing some caustic soda and carbonate of soda.

In the patent in suit the paper stock is cooked by the sulphite process.

This patent is only one of a group of patents taken out by Tompkins for processes and apparatus for treating pulp in a digester. None of them, Tompkins testified, ever got beyond use at his own mill. There are five of the Tompkins patents. The first of his patents is No. 340,640, which was applied for on July 2, 1885, and was granted on April 27, 1886. The patent in suit was the last of the five he took out and was granted on August 18, 1891.

[1] Before considering the merits of this patent, it will be necessary to dispose of some preliminary questions. It appears that this suit was commenced on August 7, 1912, when the bill was filed. As patents can only be extended by a special act of Congress and no such act is shown to have been passed respecting this patent, it is assumed the patent expired on August 18, 1908. This suit was therefore brought four years after the patent expired. Where suit is brought upon a patent which has expired, a court of equity ordinarily has no jurisdiction. An injunction does not issue in such cases. Huntington Dry Pulverized Co. v. Virginia-Carolina Chemical Co. (C. C. 1902) 121 Fed. 136. And if the suit is one to compel an infringer to account for the profits realized during the period of infringement and to pay damages there is ordinarily a complete remedy at law. See Root v. Railway Co., 105 U. S. 189, 26 L. Ed. 975 (1881), where this question was elaborately considered.

But in Tompkins v. International Paper Co., 183 Fed. 773, 106 C. C. A. 529 (1910), we held a bill was not demurrable which was filed three days before the patent expired, and which alleged that during the six years next prior to the filing of the bill complainant had not made, used, nor sold his process nor any part thereof, nor had he sustained any actual damage during such period by the enjoyment of the invention by others. It seemed to us in that case that the patentee's remedy at law was inadequate under the circumstances, because at law the patentee could not recover more than nominal damages while in equity he could recover the actual profits; and because at law he could not prove loss of license fees and he had no established license fees; and because he could not show that he lost sales as he was not in fact selling at all; and because he could not show reduction in prices through competition as there was no competition; and because he could not show that his market was destroyed by the infringer, as he was not undertaking to establish a market. The fact that in that case the bill was filed three days prior to the expiration, and in the case at bar was brought four years after the expiration of the patent, is immaterial, provided the other facts alleged in the bill show a similar condition to that disclosed in Tompkins v. International Paper Company and which led this court to the conclusion that it reached in that case.

The bill in this case avers that during the six years preceding the filing of the bill the plaintiff did not use the patented process nor sustain any damage from infringement, and we think this brings the case within the doctrine of Tompkins v. International Paper Company.

[2] The defendant also urges that the present suit cannot be maintained because of the complainant's gross laches, inasmuch as the process he claims under his patent—the quick cook process—had been used for many years before he brought his first suit, being in notorious and unconcealed use by many paper manufacturers in this country, and that it was used as early as 1895. The claim is that as these various sulphite mills were permitted, all these years, to keep on "infringing," the complainant has no right now by a suit begun in August, 1912, to come in and ask for profits and damages from the "infringement." The fact that the complainant did not have the title during the whole period of delay does not excuse laches, if laches there has been, as the courts hold that the negligence or acquiescence of a former owner has the same effect upon the assignee's rights as his own neglect or acquiescence. Woodmanse, etc., Mfg. Co. v. Williams, 68 Fed. 489, 15 C. C. A. 520; New York Grape Sugar Co. v. Buffalo Grape Sugar Co. (C. C.) 24 Fed. 604.

[3] Acquiescence and laches, however long, on the part of a patentee, may be excused by satisfactory proof that he had no knowledge or means of knowledge that his patent was being infringed. Wortendyke v. White, 30 Fed. Cas. No. 18,050. It has been held that laches is not to be imputed to the owner of a patent because of his failure to prosecute to judgment a suit against an infringer when it appears that the complainant was disabled from carrying on litigation by lack of financial means. Bradford v. Belknap Motor Co. (C. C.) 105 Fed. 63, affirmed in 115 Fed. 711, 53 C. C. A. 293; Davis v. A. H. Reid Creamery & Dairy Supply Co. (C. C.) 187 Fed. 157, affirmed 195 Fed. 80, 115 C. C. A. 112. But in Hayward v. National Bank, 96 U. S. 611, 618, 24 L. Ed. 855 (1888) the Supreme Court said:

"No sufficient reason is given for the delay in suing. His poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights."

That was not a patent case. But the statement was quoted approvingly in Leggett v. Standard Oil Co., 149 U. S. 287, 294, 13 Sup. Ct. 902, 37 L. Ed. 737 (1893), which involved the infringement of a patent, and which is understood as laying down the rule that the poverty or pecuniary embarrassment of a patentee is not a sufficient excuse for postponing the assertion of his rights or preventing the application of the doctrine of laches.

[4] In view of the conclusion which we have reached respecting the validity of the patent, it is not necessary to consider the subject of laches as fully as under other circumstances might be incumbent. We shall therefore not consider in much detail the evidence introduced by the complainant to justify his failure earlier to institute this suit. It may be remarked, however, that in addition to his poverty, his fortune having been lost, the complainant denies that he had positive knowledge of this alleged infringement until 1908, not 1891, as defendant

mistakenly asserts. And it appears that without delay thereafter he instituted a test suit against a different infringer, the International Paper Company, which was settled in 1911. Delay in prosecuting other infringers while the validity of the patent is in active litigation does not constitute laches. Stearns-Roger Mfg. Co. v. Brown, 114 Fed. 945, 52 C. C. A. 559. Negotiations were then commenced to obtain a settlement with the present defendant. The negotiations being unsuccessful, this suit was instituted in 1912. The complainant insists that prior to 1908 he had continually and persistently but without success endeavored to ascertain whether his patent was being infringed. The court below seems to have been satisfied with the evidence on this branch of the case, for the whole subject was passed over without remark in the opinion which the court rendered. The delay in instituting the present suit between 1908 and 1912 is satisfactorily accounted for by the pendency of the litigation involving the validity of the patent; and, if complainant's testimony is true that he had no actual knowledge of the infringement of his patent prior to 1908, he has satisfactorily explained the delay which unexplained might debar him on the ground of laches from the right to maintain this action. As the Supreme Court has pointed out, the defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by the person's own oath, and hard to disprove. There has been and is therefore a tendency to insist that a party, thus alleging a want of knowledge, should have used reasonable diligence to have informed himself of the facts. Foster v. Mansfield, etc., R. Co., 146 U. S. 88, 99, 13 Sup. Ct. 28, 36 L. Ed. 899 (1892). During the period involved the complainant appears to have been inquiring of everybody he met who was connected with the art as to what process was being employed in the mills. It was very difficult to ascertain whether his patent was or was not being infringed, as it was not possible to ascertain it from the form of the apparatus used, or from the raw materials used, or from the nature of the product put out. We therefore are of the opinion that, all things considered, the complainant has not lost his right to maintain this suit on the ground of laches in bringing it.

[5] This brings us to a consideration of the patent. The complainant in his specification for patent No. 458,135, the patent in suit, stated that heretofore it had been the practice to subject vegetable and other kindred material from which paper stock was made to the successive action of various treating-liquids within a closed vessel or digester, and while thus inclosed to bring the treating-liquids into intimate contact with the material by spraying the liquids in a downward direction thereon, or by agitating the mass of material and liquids together, as by rotation of the digester. He added that both methods had been found in practice to be open to objection, the first, by reason of the fact that the downwardly directed streams of liquid served to pack the paper stock material upon the bottom diaphragm of the digester, the effect of which was to transform the material into a strainer or filtering mass, gather the lignine and other material picked up by the treating-liquors upon the top of the mass, and to unevenly affect the material by the treating-liquids.

236 F.—15

He also said that it would be readily understood that, when the mass was packed upon the bottom of the digester, the upper portion of the mass would be much more affected than the lower portion, and hence the material would be fully acted upon in one portion, partially acted upon in another, and, to a great extent, unacted upon at the lowermost part of the mass. He added that agitation of the material and liquids by rotation or other movement of the digester tended in a measure to break up and destroy the fibrous character of the paper stock material thus acted on. He then went on to say:

"The object of my invention is to treat the material in a closed digester and in such a manner that no packing of the material will occur, the fiber not be injuriously affected, the adventitious materials separated therefrom, and all of the material brought into the best possible position to be evenly and effectively acted upon, and this I accomplish in a manner which I will now proceed to describe.

"It may be generally stated that the majority of the various vegetable or kindred substances from which paper stock may be made are of a lower specific gravity than water, and hence tend to float in water or in any of the treating-liquids commonly employed. It is also true that such materials will absorb the liquids within which they are immersed and when thoroughly soaked will sink or gravitate to the bottom of the vessel within which they are placed. In practice it has been found that, if the materials can be kept in a suspended condition in the treating liquid, they will be most thoroughly and effectively acted on, and also that the strength of the treating liquid may be materially reduced, as also the time required to effect the treatment.

"My improved method of treatment is based upon the theory that the material from which the paper stock is to be made should be suspended in the treating-liquid while in the digester, and while thus suspended subjected to the heating, cleansing, or chemical action of the suspending liquid."

He made but one claim, and that he stated as follows:

"The herein described art of treating fibrous and other kindred materials for their conversion into paper stock, which consists in effecting the suspension of such materials in a constantly-rising current of the treating-liquid, and while thus suspended subjecting the material to the heating, cleansing, or chemical action of the suspending-liquid."

It appears therefore that what Mr. Tompkins claims in this patent as his improved method of treatment is a suspension, in a constantly rising current of the treating-liquid in the digester, of the materials to be converted into paper stock, and while thus suspended subjecting them to "the heating, cleansing, or chemical action of the suspending-liquid."

At the time his first patent was obtained, Tompkins knew that wood was being cooked in closed digesters, rotary and upright. For instance, he knew of the Wheelright & Marshall patent, dated November 4, 1884, and that in the process there employed the circulation of the cooking liquor was taken from the bottom of the digester and by a pump or injector, returned to the upper part of the vessel to percolate downward through the mass being cooked. And he understood that straw could not be cooked in the same way that wood might be, it being a much softer and more delicate fiber than wood, and that it would pack in the bottom of the digester, thus causing the circulation to cease before the cooking was completed. So that finally he conceived the idea that if the straw or material could be held in suspension in the

cooking liquor during the entire cooking period each particle could be perfectly cooked. This he sought to accomplish in his first patent, No. 340,640. The idea was to try to effect the necessary suspension by circulating the cooking liquor upward two-thirds of the time and downward one-third of the time. When it is said that no person before Mr. Tompkins ever even hinted a suspension of the material being cooked, the fact, if it be a fact, cannot help out the validity of the patent in suit, inasmuch as Tompkins had advanced that idea in his first patent.

Then it is said that the essential feature of the patent in suit is that the suspension of the material is effected and maintained by "the constantly rising current" of the treating-liquid within the digester. How much there is in this claim is disclosed in the testimony of the defendant's expert. He testified:

"The Tompkins patent aims to effect the suspension of the materials undergoing treatment in a constantly rising current of the treating-liquid, and in order to maintain this current over the whole sectional area of the digester, as indicated by the arrows in the drawing, provides external channels for the descending return current, which is out of contact with the material. In the absence of such return channels, the currents could not possibly maintain the direction indicated by the arrows in the Tompkins drawing, and instead the descending currents would equal in volume the ascending currents, thus defeating the object of the patentee."

The court below thought that the constantly upward current of the treating-liquid was not new. The court said it was fully described and claimed prior to the Tompkins patent in patent No. 54,510, granted by the United States Patent Office on May 8, 1866, to John W. Dixon and George Harding. That patent called for a circulating tube which passed from below the diaphragm to the upper part of the digester. In this tube a reciprocating pump was placed, which was driven by machinery and produced a constant circulation of the digesting liquid from the lower chamber below the diaphragm through the tube into the upper part of the digester, or vice versa from the upper part of the chamber down through the tube and the pump into the bottom of the digester, and thence upwardly, by virtue of the pump, through the mass to be pulped.

The court in its opinion in referring to the Dixon-Harding patent speaks of its "constantly upward current." That patent indicates an upward circulation and also indicates a downward circulation. The one is no more continuous than the other, but either may be used and used continuously, to the exclusion of the other, if we correctly apprehend the matter. This no doubt was what the court meant when it referred to the "constantly upward current" of that patent.

In the first Tompkins patent, Mr. Tompkins in his specifications refers to "the old processes where the cooking liquor is circulated continuously downward" and "the material becomes compacted in the lower portion of the digester." And again he says:

"In the old processes, where the cooking liquors are circulated in one direction and downwardly continuously, the liquor is gradually weakened in its strength as it passes downward through the compacted mass."

Then he points out that one of the distinguishing features of his invention is:

The cooking of the material "in hot (about boiling) water while the latter is circulated through the former at alternate times in opposite or reversed directions, preferably downward and upward, so that all packing of the material will be prevented, and the cooking water will be made to move in such an active contact with all the particles of the material treated that they will be made to move against each other in a loosened manner in all portions of the digester and cause all the particles to be simultaneously and uniformly cooked and the soluble portions of the lignine (dissolvable in water) to be uniformly dissolved," and so forth.

Again he says:

"Another distinguishing feature is the cooking of the material with the boiling alkaline liquor under pressure while the latter is circulated through the body of the former continuously and in alternating reversed directions, preferably downward and upward at alternate times, whereby a packing of the particles of the treated material in the lower portion of the digesting-chamber, as heretofore had, is effectually prevented," and so forth.

Again he says:

"Another distinguishing feature of this invention is the treating of the disintegrated pure fiber to the action of a bleaching liquor (preferably chlorine liquor) with or without pressure, while it (the liquor) is being continuously circulated through the mass of fiber in alternating reversed directions, whereby all the particles of the fiber will be in a state of constant movement in the liquor, and be simultaneously and uniformly acted on by the chlorine or other bleaching agent held in the water, which saturates and penetrates these constantly moving fibers so that each fiber will be as effectually acted on both externally and internally by the bleaching agent as the others. The advantageous result had from this part of my invention is that the bleaching of the fiber can be effected without any handling whatever in a few hours, where in the old process it required treatment for two or more days and employment of labor to handle and stir the mass being treated, so as to expose all portions to the action of the bleaching agent, which is wholly done in the practice of my invention by the reversed circulations of the bleaching liquor."

Again he says:

"I have described my new process when a single digesting chamber is used; but, if preferred, this process can be practiced in an apparatus employing two digesters properly connected with each other by suitable pipes so that when the circulations of the treating waters and liquors are upwardly through the mass in one digesting chamber they will be downwardly through that in the other, and the reverse alternately, when the same advantageous results will be had as when the successive treatments are had in a single chamber."

The alleged novelty of his first patent is that he circulates the liquid alternately upward and downward by means of the piping and pumps described, and he states that by his process "the material is made to be constantly suspended in the treating liquor in the best condition for the active circulation of the treating liquor between the suspended particles" by the reversed currents.

In his testimony in this case he testified repeatedly that in actual operation under this first patent he circulated the liquor upward two-thirds of the time and downward one-third of the time.

The difference between the process of Tompkins' first patent and his last, the patent in suit, is in this: In his first patent he circulated

the liquid upward for two-thirds of the time, and downward one-third of the time, while in the patent in suit the circulation from below is said to be "always from below upward." Nevertheless provision is made for a reversed direction of the circulation in treating certain classes of the material. In his specification he says:

"When treating classes of paper-stock material, it is occasionally found that the light feathery portions tend to be carried upward and to lodge against the digester surface of the diaphragm B. As the diaphragm becomes covered with this material, the circulation is of course impeded, and in order to overcome this difficulty I have arranged the pump G and the various communicating pipes so that the direction of circulation of the liquid within the digester may be reversed and the liquid drawn from the lower chamber $C^1$ and delivered into the upper chamber $C$, and from thence through the diaphragm B in a downward direction upon the material within the digesting chamber."

Under both patents the result stated is the same, the prevention of the packing of the materials at the bottom of the digesting chamber. Moreover, in practicing the invention of the patent in suit Mr. Tompkins used precisely the same apparatus he used in practicing the invention of his first patent. Mr. Tompkins was asked: "When you conceived the principle of suspension as set forth in the patent in suit herein, what method of cooking were you then using?" He replied: "We were using an upright digester equipped with pipes and pumps for reversing the cooking liquor by circulating it up two-thirds of the time through the mass and downward one-third of the time." He was asked: "In other words, you were using an apparatus designed to handle circulating liquor, is this correct?" He replied: "It is." He was asked: "What steps did you take to utilize the principle of suspension disclosed in the patent in suit?" He replied: "We took the apparatus we were then using and ran the pump slowly so as to produce a continuous upward current of the treating liquid sufficient to overcome specific gravity of the cooking material." He was asked: "That is, I understand that you applied your new method as disclosed in the patent in suit to the apparatus which you then were using and which was designed to circulate liquor, is this correct?" He replied: "It is."

In view of the first Tompkins' patent, this court is unable to find in the patent in suit any patentable novelty. The official chemist of the American Paper & Pulp Association testified on behalf of the defendant. His testimony shows him to be thoroughly informed as to the processes of paper manufacture in this country and abroad. His testimony is absolutely convincing that the theory of the patent in suit is, to use his language, "fully disclosed" in the first Tompkins' patent, and that "the apparatus and method for carrying the theory into effect are also fully described" therein.

This expert was asked "whether or not the cooking of pulp, by the sulphite process, in a digester provided with a steam inlet pipe at the bottom, and a relief pipe and valve set therein, and connected to the top of the digester, was carried on continuously in practically every pulp mill in the United States ever since the starting of the digesters of the Richmond Paper Company at Providence in 1884, and whether or not the carrying on of the sulphite pulp process, by means of di-

gesters similarly equipped, was generally known and publicly discussed in trade papers and at meetings of trade and scientific societies." His answer to the question follows in part:

"With the exception of a very few Mitscherlich digesters, a few Globe rotaries, and three or four Salmon-Brungger digesters, which were heated by a jacket, for the purpose of forming a protective lining, through deposition of lime salts upon the inner wall of the digester, it is true that the cooking of pulp by the sulphite process in digesters provided with a steam inlet pipe, at the bottom, and a relief pipe and valve set therein connected to the top of the digester, was carried on continuously and universally, and to a constantly increasing extent, in sulphite pulp mills of this country to the exclusion of any other means of cooking until to-day probably not less than 5,000 tons of sulphite pulp is daily so produced in this country and great additional quantities in Europe. Precisely similar methods were employed in Japan as early as 1885, as the result of the visit of Mr. H. Okawa, to which I have previously referred.

"The method described, and the apparatus itself, have been well known in the trade, and among pulp and paper chemists and engineers and to all those skilled in the art for many years, beginning with 1883 in this country, at Richmond Paper Company, among those there employed and rapidly extending generally throughout the classes indicated."

The court below was right in its conclusion that the patent in suit was not valid and was not infringed.

Decree affirmed.