## SIMPSON v. NEWPORT NEWS SHIP-BUILDING & DRY DOCK CO.

(District Court, S. D. New York. March 22, 1920.)

1. Patents ⬡289(3)—Laches of predecessors in title in resisting infringement of patent held chargeable to plaintiff.

Plaintiff, in patent infringement suit, whose right to accounting was contested on the ground of laches, *held* required to bear the burden of dilatory acts and conduct of his predecessors, whether well or ill advised.

2. Patents ⬡289(2)—Laches will not ordinarily bar infringement suit, but only right to accounting.

Delay in bringing suit for infringement of patent will not bar the suit, except in extreme situations, but only the right to an accounting.

3. Patents ⬡289(2)—Plaintiff may be entitled to injunction, though guilty of laches barring accounting for profits.

Plaintiff in patent infringement suit may be entitled to an injunction, though guilty of laches barring any accounting for profits.

4. Patents ⬡167(1)—Patent covering ballast tanks for ships held to sufficiently describe construction claimed.

Patent for ballast tanks for ships *held* to sufficiently show or describe the construction claimed.

5. Patents ⬡167(1)—Features not described in specification cannot be validly claimed.

Claims for features not described in specifications are void.

6. Patents ⬡328—932,722, claims 1, 2, and 3, for ballast tanks for ships, held invalid, as containing new matter unaccompanied by oath.

Simpson patent, No. 932,722, claims 1, 2, and 3, for ballast tanks for ships to be "hung

from the hatch coaming," *held* invalid, where patentability depended on the quoted portion, which was added by amendment of claim and unaccompanied by oath.

**7. Patents ⬅102—Defense of "new matter" in claims unaccompanied by oath is available to particular defendant, as well as to public.**

In patent infringement suit, the defense of "new matter" in claims unaccompanied by oath is available for the benefit, not only of a particular defendant, but also of the public.

**8. Patents ⬅109—Matter which does not read on original specification or claims, introduced by amendment without oath, is void.**

When matter which does not read on the original specification or claims is introduced by amendment without oath, it is void, notwithstanding that it may be shown in the drawings or inferred by those skilled in the art.

**9. Patents ⬅160—File wrapper cannot be read in aid of patentee.**

The file wrapper cannot be read in aid of the patentee, in construing his specification and claims.

**10. Patents ⬅328—932,722, claims 1, 2, and 3, for ballast tanks for ships, held invalid.**

Simpson patent, No. 932,722, claims 1, 2, and 3, for ballast tanks for ships to be hung from the hatch coaming, *held* invalid for want of invention.

In Equity. Suit by George Simpson against the Newport News Shipbuilding & Dry Dock Company for infringement of claims 1, 2, and 3 of letters patent No. 932,-722, granted August 31, 1909, to George Simpson on application filed April 13, 1908. Bill dismissed.

Decree affirmed 18 F.(2d) 325.

Charles McC. Chapman, of New York City, for plaintiff.

James R. Sheffield and James J. Cosgrove, both of New York City, for defendant.

MAYER, District Judge. The sharpness of the controversy, the fact that the testimony was taken by deposition, the importance as asserted of the subject-matter in the shipbuilding art, and the several grounds upon which the patent is attacked have combined to require a consideration of all the substantial points raised. This opinion will therefore deal with more than is strictly necessary to a decision of the case, in order that litigants and counsel may have the court's view, for whatever service they may be, in the event of appellate review.

"The present invention," the patentee stated, "relates to ballast tanks for ships, and is embodied in a novel construction and arrangement of the tanks, whereby the supports for the tank walls are wholly internally arranged, and the tanks so disposed as to interfere to the least possible extent with the disposal of the cargo. The tanks may be arranged, in accordance with the invention, either longitudinally along the inner sides of the ship, or transversely, in the latter case each tank preferably resting upon the top of one of the transverse bulkheads. In either construction, the framing for the walls of the tank is wholly internal, and the tanks are preferably arranged with sloping walls presenting a smooth surface to the hold, which does not interfere with the stowage of the cargo, and in shipping coal, for example, is of use in distributing coal in the hold and obviating the necessity of trimming."

The claims are as follows:

"1. A ballast tank for ships, located near the top of the cargo space of the ship and within the hull, and having its inner wall, which is exposed in said cargo space, smooth and obstructionless; said wall being hung from the hatch coaming, and provided with a framing all of which is located wholly in the interior of the tank, said framing including braces fixed to said wall and adapted to be connected with the framing of the ship.

"2. A ship, having prismshaped or triangular-shaped ballast tanks, located lengthwise of the ship and having suitable framing or stiffening, all of which is arranged wholly within the tank, whereby the surface of the inner wall of the tank exposed in the cargo space is smooth; said inner wall being hung from the hatch coaming, and said framing including supporting braces connected at one end with said wall and at the opposite end with the framing of the ship.

"3. Ballast tanks for ships, having a topside fore and aft arrangement, and provided with framing or stiffening members all located wholly inside of the tanks, the inner walls of the tanks presenting smooth exteriors to the vessel's hold; said inner walls being hung from the hatch coaming, and said framing including supporting braces rigidly fixed to said walls and adapted to be connected with the framing of the ship."

The structure is familiarly referred to as "topside tank," or "topside ballast tank," or "topside wing tank," and the type of ship is known as "cargo carrier," except in the navy, where it is known as "collier." The ships were designed to carry bulk cargo or loose cargo, such as coal or ore. During the war the Everett, Walden, Melrose, and Newton carried general cargo, such as cotton in bales, pork, bacon, lard, and the like. Plaintiff urges that the problem solved by him

was (in the language of the brief on his behalf) :

"To provide ballast in sufficient amount in the right place to give the ship's stability when running without cargo, and to eliminate the ballast when running with cargo, and to so construct the ballast tanks as to avoid the use of the well-known and objectionable cantilever frames in the ship's construction, without resorting and reverting to the still more objectionable pillars, stanchions, and 'tween-deck beams in the hold of the ships. In doing this, plaintiff designed a vessel wherein the ballast tanks are located wholly within the ship's structure and in the wings of the hold at the top sides thereof, and which tanks are 'hung from the hatch coaming' at the top of their inboard, sloping walls, supported at their bottom, or gutter, on the frames of the ship, and braced from their sloping wall to the gunwale of the ship. Being a practical shipbuilder and marine architect, plaintiff knew the objections to and faults in the old cantilever and stanchioned and beamed structures, * * * and, as time and cost were of the essence of the problem to be solved, he evolved the new type or cargo carrier, or collier, wherein the ballast is provided for in fore and aft tanks, arranged in the waste space of the ship's hold, and shaped and constructed and supported so as to have many important functions and advantages over all other types of ships. * * *

"The practical details, involved in the utilization of the ballast tanks, are not, of course, set forth in the patent, since they appeal, rather, to the skill of the artisan than the faculty of the inventor. * * * In practice, the water ballast is pumped into the tanks by the ship's engines, when and as required, and is drained, or emptied, from said tanks by opening valves or cocks in the bottom thereof. * * * The vessels are loaded very rapidly—in a few hours—by chutes directly into the hold, the shape and location of the ballast tanks making the holds self-trimming. * * *

"In practice, for the purpose of installing the tanks and to enable them to sustain their ballast load, the fore and aft hatch coaming is made continuous. The inboard, sloping walls of the tanks are 'hung from the hatch coaming,' by proper connection with the latter, as set forth in the claims, and said coaming is for practical purposes made continuous, as just noted. Thus the hatch coaming becomes, in the type of ship inaugurated by plaintiff, one of the important strength members, and is, in fact, * * *

a girder of great strength extending fore and aft of the ship on both sides of the hatchways, braced at intervals, by the transverse, or athwartship, coamings and other adjacent co-operative members of the vessel. Hence, in practice, the two parallel lines of fore and aft ballast tanks, located in the wings of the vessel, are 'hung from the hatch coaming,' the latter being duplex in character and of great structural strength. * * * In other words, the hatch coamings, from which the tanks are 'hung' are arranged in parallelism fore and aft of the vessel and form the longitudinal boundaries of the hatchways; they are braced at intervals by beams extending between—'tween-hatch beams; and they are also braced at intervals by deck beams extending from the outer sides of the coamings to the transverse frames of the ship at the gunwales. Other minor supports and stiffeners, such as angles and platings, are also arranged in co-operative relation such that strength is added to the 'huge hallow girder' * * * which is supported at its extreme ends by beams and bulkheads, so that it in turn may support the sloping wall of the ballast tanks, as described by the claims of the patent in suit.

"In practice, the topside ballast tanks are required to sustain the great internal weight of their ballast water, and to withstand great external pressure or stress. * * * The braces, as shown in the patent, extend from the sloping, inner wall of the tanks to the gunwale of the ship. * * * It is well-known * * * that the gunwale is another great strength member of the ship, being made up of (1) the shear strake; (2) its doubling; (3) the deck stringer; and (4) the deck stringer plate.

"Thus, in the practical carrying out of plaintiff's invention, * * * two of the most important members of the ship are utilized, viz. the hatch coaming and the gunwale, and the inner, sloping wall of the tank is hung from the former and strutted or braced to or from the latter. In practice, also, the lower, outboard edges of the tanks (at their gutters) are supported by brackets, or 'knee plates,' riveted thereto and to the frames ('transverse frames') of the ship."

The patent, thus setting forth what is claimed to be a marked advance in the art, is resisted on the following grounds: (1) Lack of the statutory description of the alleged invention of the claims of the patent; (2) new matter inserted in the claims unaccompanied by an oath; (3) complete anticipation; (4) lack of invention; (5) non-

infringement; (6) laches amounting to an equitable estoppel, or, in any event, such delay as bars any recovery of profits or damages.

It is desirable briefly to outline the situation at the time of, antecedent to, and subsequent to the bringing of this suit on October 13, 1917, by reason of the alleged infringement by defendant in the building of the Proteus and Nereus.

The United States government built or had built for it a number of navy colliers, which at the time of their construction were claimed by plaintiff to embody the alleged invention of the patent in suit. The Mars, Hector, and Vulcan were built by the Maryland Steel Company under a contract with the United States dated in September, 1908, and were delivered to the United States on August 28, September 15, and October 20, 1909, respectively. The Cyclops was built by William Cramp & Sons Ship & Engine Building Company under a contract dated March 24, 1909, and delivered November 8, 1910. The Neptune was built by Maryland Steel Company under a contract dated September 23, 1909, and delivered in July, 1911. The Jupiter was built by the Navy Department in 1911–1913, and completed April 7, 1913. The Nereus and Proteus were built under contracts dated August 29, 1911.

The Navy Department had issued a circular in April, 1911; bids based on this circular were submitted June 27, 1911, and the contracts awarded as stated supra. The construction work was commenced on the Proteus October 31, 1911, and on the Nereus December 4, 1911, and these vessels were delivered to the United States on July 5, 1913, and September 10, 1913, respectively.

Shortly after the patent was issued, viz. on October 11, 1909, a notice of infringement was sent to Maryland Steel Company. At that time Harroway-Dixon Company was the owner of the patent. Plaintiff then represented Harroway-Dixon Company, but never succeeded in having it pay royalties or take out a license. Harroway-Dixon Company, although urged by plaintiff, refused to bring suit against Maryland Steel Company, and so refused to do on the advice of its lawyers. Whether the advice was good or bad, the fact remains that suit was not brought, and, indeed, although after plaintiff became the owner of the patent on January 31, 1917, a notice of infringement was sent to Maryland Steel Company, no suit against that concern was ever commenced.

A notice of infringement was sent to the Cramp Company on June 25, 1910, in connection with the construction of the Cyclops; but the Cramp Company, on the advice of patent attorneys well known to this court, refused to pay anything but possibly a nominal royalty, on the ground that the patent was invalid and not infringed. A suit against the Cramp Company was commenced after this suit against this defendant was inaugurated. No steps have been taken against the United States in respect of the Jupiter.

In respect of this defendant the facts are as follows:

On May 18, 1911, before defendant submitted its bids, the Harroway-Dixon Company notified it that it would infringe the patent in suit, if it adopted the construction which it subsequently did adopt. On September 25, 1911, after the construction contracts had been signed, defendant wrote Harroway-Dixon Company that it would not take a license. There was an interview in October, 1911, between plaintiff and Gatewood, defendant's naval architect, as to payment of royalties. There are different interpretations as to whose version is correct. The important feature is that defendant had made clear that it believed it had the right to construct the vessels in the manner in which it did, and that it refused to recognize the rights asserted under the patent.

[1] Thus, with full knowledge of the attitude of defendant and the circumstances in similar regard surrounding the construction of the other colliers by other companies and by the government, plaintiff stood idly by for nearly six years after the work of construction began on the Proteus, and for more than six years after the making of the contracts for the Proteus and the Nereus. By "plaintiff" is meant, not only this "plaintiff," but his assignors and predecessors in title. Assuming all the difficulties to be as related by plaintiff in his acquisition in January, 1917, of the title under which he now sues, he must nevertheless bear the burden of the acts of his predecessors, and their conduct, whether well or ill advised, will not be relieved in his favor and against defendant. Tompkins v. St. Regis Paper Co. (C. C. A.) 236 F. 221.

[2] In view, however, of the notice of May 18, 1911, this is one of those cases where delay will not bar the suit. Such bar occurs only in extreme situations, as illustrated in Richardson v. Osborne (C. C.) 82 F. 95, affirmed (C. C. A.) 93 F. 828.

[3] But, on the question of an accounting, it may be observed that it seems now well established that equity will not countenance

such delays as here occurred, when it was the duty of the owners of the patent to move with that promptness which would be reasonable under all the circumstances, and it may well be that, if plaintiff were entitled to an injunction, he nevertheless would not be entitled to an accounting. Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526; Mosler v. Lurie (C. C. A.) 209 F. 364.

[4] Concluding thus that the suit is not barred because of laches, the next question is whether the construction claimed in the patent is not shown nor described therein. The vital feature of the three claims of the patent is the hanging of the inner sloping wall of the tank from the hatch coaming.

It will be noted that in claim 1 the language is, "said wall being hung from the hatch coaming;" in claim 2, "said inner wall being hung from the hatch coaming;" in claim 3, "said inner walls being hung from the hatch coaming." The feature thus described, and the claim by the patentee's attorney that the entire tank is hung from the hatch coaming, are the points on which the allowance of the claims was obtained.

[5] It is doubtful whether these features are described in the specification, and, if not described, the claims, even though containing them, would be void under familiar authority. Yet the courts are not alert to find against a patent on this ground. Besides, plaintiff has introduced evidence showing that those skilled in the art would read the specification as he contends. Therefore, while the careful and close technical analysis of the specification and claims presented by counsel for defendant raises a real question, I have concluded that the contentions advanced should not be sustained, and that the patent in this regard is valid.

[6,7] A more serious question, however, arises in respect of the introduction of matter which defendant contends is "new" matter not supported by an oath. Such a defense is not, in any sense, technical. It goes to the very heart of a patentee's right, and the defense of "new matter" is available for the benefit, not only of a particular defendant, but also of the public. The monopoly which the patentee gains must be clearly obtained; else he may unjustly retard commerce or place unnecessary burdens upon it.

Plaintiff obtained a British patent on November 12, 1908 (No. 4,845 of 1908), on an application made on March 16, 1908. Plaintiff's application for the United States patent in suit was filed on April 13, 1908, and verified April 6, 1908. The Simpson British patent did not disclose the feature of hanging the tank or its inner sloping wall from the hatch coaming, continuous or discontinuous; it merely illustrated, described, and claimed the internally framed tank. It reads, in part, as follows:

"This invention relates to improvements in the construction of those prism-shaped or triangular-shaped water ballast tanks of ships, which are arranged beneath the deck and incorporated with the structure of the vessel. According to my invention, I construct such tanks with all of the framing and stiffening on the inside, so as to present a smooth exterior to the vessel's hold. The tanks may be arranged athwartship, preferably adjoining a transverse bulkhead, or they may be arranged fore and aft along the vessel's topsides. * * *

"Having now particularly described and ascertained the nature of my said invention and in what manner the same is to be performed, I would observe that, so far as regards athwartship tanks, I am aware of the patent of De Rusett, No. 6609 of 1906, and claim nothing therein claimed or described, but I declare that what I claim is:

"1. The method of construction of prism-shaped or triangular-shaped ballast tanks, with all of the framing and stiffening on the inside and presenting a smooth surface to the vessel's hold, substantially as set forth.

"2. Top side fore and aft ballast tanks, having all of the framing and stiffening on the inside, and presenting a smooth exterior to the vessel's hold, substantially as described and shown by Fig. 2 of the drawings."

The date of the application for the British patent is so near that of the application for the United States patent that it makes clear what was in Simpson's mind when he filed his application for his United States patent. If he then knew or appreciated the "hung from the hatch coaming" feature, it was easy enough to so state.

The original claims clearly failed (as did the British patent) to mention the hatch coamings or the hanging therefrom. These claims were rejected on June 10, 1908, on the De Russet patent, No. 6,609 of March, 1909. On January 13, 1909, the applicant canceled the original four claims and substituted three new claims. These new claims were rejected on Livingston & Sanderson, British patent No. 10,088 of 1897. On April 13, 1909, Simpson canceled the three claims and substituted three new claims. In the first of these new claims he set forth for the first time a structure in which the inner wall of the tank was "hung from the hatch coam-

ing." On May 18, 1909, these claims were rejected again on the Livingston British patent. On June 11, 1909, after a personal interview with the examiner, the claims were again canceled and new claims substituted. The first of these new claims was identical with the present claim 1, while the other two claims were variations of those the applicant had canceled.

In the next action, on July 7, 1909, a new and an assistant examiner was in charge, and he allowed claim 1, but rejected the other two, suggesting, however, that these latter would probably be favorably received if they incorporated the feature of hanging from the hatch coamings. On July 14, 1909, new claims were accordingly substituted and then allowed.

From the foregoing outline (amply supported by the detailed history which the file wrapper discloses), it is apparent that the amended claim of April 13, 1909, was an afterthought. Normally, this important feature, if in the applicant's mind, would have been shown at the beginning.

It is not a question of language, but of substance. The situation is not the familiar one, where the specification is clear and there is a phraseological battle between applicant and Patent Office, in respect of apt expression or enlargement or diminution of scope of claims. Without the feature added on April 13, 1909, it is plain from the prior art that there was no invention. The addition, therefore, was vital, and the failure to support it by oath renders the patent invalid.

[8] That there is no inconsistency between this conclusion and that supra, which refuses to sustain defendant's contention as to lack of statutory description, is exemplified by the doctrine that, when matter which does not read on the original specification or claims is introduced by amendment without an oath, it is void, notwithstanding that it may be shown in the drawings or inferred by those skilled in the art. Wolff Truck Frame Co. v. American Steel Foundries (C. C. A.) 195 F. 940; American Steel Foundries Co. v. Scullin-Gallagher Iron & Steel Co. (C. C. A.) 197 F. 49; Steward v. American Co., 215 U. S. 161, 163, 30 S. Ct. 46, 54 L. Ed. 139; Kintner v. Atlantic Co. (D. C.) 230 F. 829, affirmed (C. C. A.) 240 F. 716; Hestonville Co. v. McDuffee (C. C. A.) 185 F. 798.

[9] The file wrapper cannot be read in aid of the patentee in construing his specification and claims. Claims must be construed, so far as he is concerned, in supporting their meaning within the four corners of the language used. Per contra, the file wrapper must be examined to ascertain whether new matter has been added without an oath.

[10] There is, however, another ground upon which plaintiff must fail. Both sides have discussed much prior art, but all this discussion may be disposed of by the observation that Simpson's contribution (if otherwise valid) would probably have risen to invention, but for Johns and Frear. It is not to be understood that the court has lightly passed by either the Harroway-Dixon patents and publications or the Livingston & Sanderson British patent No. 10,088 of 1897; yet I think that plaintiff's arguments as to the meaning of these patents and publications is rather more persuasive than defendant's.

But the German patent to Harry E. Johns, No. 142,312, issued July 8, 1903, if not an anticipation, is at least so far advanced as to negative invention by Simpson. This patent commences:

"In the transoceanic transportation of the somewhat soft German coal in steamers, sailing vessels, or barges, the coal has frequently reached its destination in such a broken-up state that the consignee has refused to accept it. The reason for such breaking up of the coal is to be found in the unsuitable cargo spaces of the transport vessels. Said cargo spaces are all of such shapes that some parts of the same do not admit of being directly filled with coal, the latter having to be specially shoveled or otherwise put into such parts. This trimming of the coal however, which is indispensable in order to fill also the less easily accessible parts of a cargo space, necessarily entails more or less breaking up of the coal. The work of breaking up is then continued on the ocean, when the coal begins to work—i. e., is pushed back and forth in the cargo space as a result of the movements of the ship —since such cargo space, owing to its many not readily accessible parts, e. g., between the deck beams, below deck, can never be completely filled. The lumps of coal are broken into pieces by being thrown against one another and against the projections (corner reinforcements, deck beams, etc.) in the cargo space; these projections having previously helped to break up the lumps of coal dropping upon them as the coal is thrown in.

"The above-mentioned drawbacks are sought to be eliminated by giving the cargo spaces such a shape that they will trim automatically—i. e., that they admit of being completely filled without trimming, as the

coal is put in through chutes or tipping devices, and furthermore by making the walls of the cargo space perfectly smooth, obviating as far as practicable all projections," etc.

Johns continues:

"The purpose sought to be attained is arrived at by giving the cargo spaces the shape of a truncated hollow pyramid, the lateral walls of which have an angle of inclination to the horizontal corresponding to the angle of slope of the heap of coal as thrown in, and by making said lateral walls and the base of such pyramid-shaped cargo spaces as smooth as possible. The spaces of the vessel not to be used for the coal cargo and located on the sides of or between the pyramid-shaped coal cargo spaces may be fitted and utilized for the reception of liquid cargoes or of water ballast."

The Simpson Fig. 4 is shown below:

toward the side plates e, thus, bearing a relation to the cargo space similar to that described in connection with the transverse tanks. In this construction, the tanks are supported upon brackets f, secured to ribs f2, which extend vertically along the inner side of the hull plate e; and the structure is strengthened by means of inclined braces d5, which extend from the ribs adjacent to the wall plate d10 to brackets d6 located near the top of the tank and secured to the ribs f2 and the transverse deck-supporting members f3. The tanks constructed in this way may extend the entire length of the cargo space, being located between the sides of the hatches c20 and the gunwale of the ship. If desired, tanks of this description located lengthwise of the ship may be combined with transverse tanks, or either may be used separately."

Compare with the foregoing the Johns drawing and description:

"Figure 4 is a transverse section, showing the construction of a tank arranged along the side of the ship. * * * In the modification shown in Fig. 4, the tanks are built lengthwise of the vessel, the side plates e of the hull forming one wall of the tank, while the other wall d10 slopes downward

"As apparent from the drawing, the walls in the cargo space shown are smooth

throughout—i. e., nowhere are there any corner reinforcements or projections of any kind which might cause a breaking up of the lumps of coal striking them as the coal is put in through chutes or otherwise. Said walls *a* of the coal cargo space *l* are inclined relative to the bottom *b* of the same, the angle of inclination of said walls corresponding to the angle slope *w* of the heaps of coal *k*. Such an arrangement of the cargo space in the shape of a hollow pyramid enables it to be completely filled by simply throwing in the coal through chutes, so that the tedious work of trimming, which is indispensable in differently shaped cargo spaces, becomes unnecessary. In a cargo space of this shape it is then only necessary, after the loading has been finished, to spread apart the top of the coal pyramid in the loading hatch *c*. * * * The spaces *d* surrounding the pyramid-shaped cargo space may be equipped for the reception of liquid cargoes or of water ballast. The freighter referred to may, of course, be used also for the transportation of other material in bulk."

The claim reads:

"Freight vessel designed particularly for the transportation of coal the cargo spaces of which have the shape of truncated hollow pyramids the inclined lateral walls of which correspond to the angle of slope of the heaps of coal as thrown in."

I see no escape from Bentley's discussion, from which the following is extracted:

"The Johns tank is organized as a cantilever; the sloping wall, internally stiffened by inclined ribs of beams, is marked *a* in the patent; and I have applied the same letter to the corresponding art in the models. The remainder of the internal stiffening frame of the Johns tank is made up by the vertical frame bars of the ship, the horizontal deck beams, and a diagonal stay or brace plate, extending from the corner of the vessel to the middle of the inclined rib or frame beam on the sloping wall, and serving to hold the said rib or frame beam on the sloping wall up to its task as a strut or prop for the longitudinal girder extending fore and aft on the top of the ship, which is also utilized as a hatch coaming.

"Fig. 2 of the Johns patent shows that the hold has a length of about twice the width of the vessel, which would make it about 50 feet in a vessel of 25-foot beam. The entire length of this hold is free from obstructions, either by stanchions or by hold beams extending across the vessel. That means that the vessel is of the type wherein the stiffness of the side walls of the ship eliminates the need for hold beams, and wherein the strut formation of the topside tank eliminates the need for pillars or stanchions."

I think, also, that it is clear that Johns is applicable to and practicable in a vessel of any size or depth carrying bulk cargo.

### Hugo P. Frear.

The record shows that Frear is a naval architect of ability and experience and thoroughly familiar with the art. The limits of an opinion (already long) do not permit an extended discussion of Frear's contributions. The short way is to refer to his testimony, which (exclusive of the exhibits) covers hardly 100 printed pages. The two impressive prior art references for which he is responsible are the 1897 publication and the 1904 designs for altering the Wyefield.

I do not entertain any doubt as to the correctness of his testimony as to the Wyefield alteration plans, nor as to the legal sufficiency of the disclosure and publication (in the technical sense) of these plans. His memory successfully withstood careful and searching cross-examination and his testimony carries conviction.

In view of Johns and Frear, I am unable to conclude that the patent in suit discloses invention. Thus holding, it is unnecessary to consider questions of infringement.

The bill is dismissed, but without costs.