## VOGT INSTANT FREEZERS, Inc., v. NEW YORK ESKIMO PIE CORPORATION.
### No. 4855.

District Court, E. D. New York.
May 31, 1932.

Dean, Fairbank, Hirsch & Foster, of New York City (Clair W. Fairbank and S. A. Demma, both of New York City, of counsel), for plaintiff.

Edward G. Curtis and Edward F. Dunne, Jr., both of New York City (Janney, Blair & Curtis, of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

■ This is an action in which plaintiff seeks relief by injunction and money damages for the alleged infringement of patent No. 1,733,740, issued to Clarence W. Vogt, assignor to Vogt Instant Freezers, Incorporated, for apparatus for manufacturing ice cream and the like, granted October 29, 1929, and patent No. 1,742,171, issued to Clarence W. Vogt, assignor to Vogt Instant Freezers, Inc., for process of manufacturing ice cream or the like, granted December 31, 1929.

The defendant by its answer interposes the defenses of invalidity, noninfringement, and estoppel.

The plaintiff is a Kentucky corporation, lately engaged in the development of an ice cream freezer, which is now said to be on the market, but, as plaintiff admits, is not covered by the patents in suit.

The defendant is a New York corporation, and a subsidiary of the original Eskimo Pie Corporation, a Delaware corporation, and maintains a factory in the borough of Brooklyn, N. Y., in this district, wherein it manufactures ice cream, particularly for the production of chocolate-coated ice cream bars, sold under the trade-mark Eskimo Pie, and the apparatus and process used by the defendant in such factory are alleged by the plaintiff to infringe claims 9, 10, and 11 of patent No. 1,733,740, and claims 9 to 12, both inclusive, and 14 and 15, of patent No. 1,742,171, respectively.

Patent No. 1,733,740 is addressed to ice cream freezing apparatus comprising a reservoir to receive semifrozen mix to be drawn upward through a pipe by suction and spread upon rolls kept extremely cold by internally circulated brine, the soft mix being intended to freeze almost instantly upon the rolls, scrapers are arranged to chip the frozen ice cream from the rolls, a belt conveyer is designed to carry the chips to a can, and a com-

pressor worm above the can forces its contents into a compact body.

Patent No. 1,742,171 is based upon the same machine that is disclosed in patent No. 1,733,740, and claims as a process the functions of this machine.

Both patents arise out of one application, which was divided during the prosecution in the Patent Office.

Late in the year 1926, R. S. Reynolds was the president of the United States Foil Company, which then controlled the Eskimo Pie Corporation, of which he was also the president, and through him the said Clarence W. Vogt was given a position with the latter company, at Louisville, Ky., and began work on January 2, 1927.

The work assigned by said R. S. Reynolds to said Clarence W. Vogt was the development of a machine capable of freezing ice cream instantly to a finished product, thus avoiding the necessity of using the usual refrigerated hardening room; and this is true whether the said Vogt's conception of the methods or devices antedated his employment or not.

The said Clarence W. Vogt, on January 18, 1927, filed a patent application, serial No. 161,844, covering a method and machine which he contended would accomplish that purpose. From that application, which was divided as required by the Patent Office, the patent in suit eventuated.

Under the stipulation made in this action, Vogt cannot claim conception of method or devices, respectively, earlier than July 1, 1926.

The conflicting claims of the said Reynolds and Vogt, as to originality of conception of the said machine, do not require consideration, in the face of the assignments and agreements made by Vogt and Eskimo Pie Corporation and the assignment by Eskimo Pie Corporation to the plaintiff herein.

During the months of January and February, 1927, Vogt constructed what he calls a test unit to demonstrate the machine of his patent application.

This test unit was constructed at the expense of the Eskimo Pie Corporation, and was experimented upon at the plant of the Frozen Pure Ice Cream Company, at Louisville, Ky.

This machine had rolls upon which partially frozen ice cream was spread and frozen, and scrapers to chip off the frozen material. It was operated in a small hardening room.

A written contract of employment was entered into by Vogt with the Eskimo Pie Corporation, on February 25, 1927, in and by which he agreed to assign to the corporation the patent application which he had filed on January 18, 1927, on which the patents in suit are based.

Although Vogt continued to experiment with the said so-called test unit, he was unable to produce ice cream which had a proper overrun, that is, one that was sufficiently aerated to be marketable.

Commercial ice cream of the general type must contain a large percentage of air to be profitable to the manufacturer and to be acceptable to the public, as without proper aeration it would be soggy.

In his efforts to overcome the said defect, Vogt, using portions of the first test unit and adding others, built a new machine, in the operation of which unfrozen ice cream mix was sprayed against cold rolls.

This machine differed from the one shown in the patents in suit in the use of spraying nozzles, and Vogt contended it was not covered by them.

Vogt took out a separate patent upon it.

Both Vogt and the officials of the Eskimo Pie Corporation considered that the spraying machine possessed good possibilities for successful development, and the Eskimo Pie Corporation was willing to spend more money to develop the idea, and Vogt tried to put it on the market.

Vogt refused to comply with the request of the Eskimo Pie Corporation, to assign to it the patent application covering the spray machine. In view of this new machine, Vogt wanted a more favorable contract, which was refused.

In August, 1927, Vogt resigned his position with the Eskimo Pie Corporation, and in the same month organized the plaintiff corporation.

The dispute continued, resulting in the exchange of the reports or opinions of the attorneys for the respective parties, and, while the claim of the Eskimo Pie Corporation to an assignment of said patent application was denied by Vogt's counsel, they conceded that said corporation had shop rights in the spray machine.

Plaintiff's attorneys in their said report, which was submitted to defendant, contended that the said spray machine was quite different from the first machine which had been assigned to Eskimo Pie Corporation, and said corporation had shop rights as to this spray

machine, but no right to claim the entire patent rights in it.

After a series of negotiations and pursuant to a written offer from plaintiff, Eskimo Pie Corporation, on December 5, 1927, in consideration of $42,000 paid to it, assigned to plaintiff all its rights in the Vogt experiments, devices, and patent applications. This assignment conveyed to the plaintiff the shop rights, and all other rights which Eskimo Pie Corporation had in the spray machine and the experimental machinery, canceled Vogt's contract, and released to plaintiff all rights in the then pending patent application which eventuated in the patents in suit.

The defendant redesigned the ice cream making apparatus in its Brooklyn plant, late in 1928, the work being done by men who knew nothing of Vogt, and whose ideas came from old chocolate-cooling machinery, and from a fish-freezing apparatus they saw in Gloucester, Mass.

There is no evidence that these men received any suggestions from R. S. Reynolds as to the form of the device, or the principle on which it was to be founded, other than the request of said R. S. Reynolds to the engineers of the company to find out the makers of chocolate machinery and consult them as to the possibility under their devices of reducing the temperature whereby ice cream could be handled in that manner.

The defendant's plant so redesigned went into operation in May, 1929.

The application for the patent in suit contained no claims which would read upon the redesigned apparatus used in the defendant's factory in Brooklyn, N. Y., when the Eskimo Pie Corporation assigned its rights in such application to the plaintiff, and neither the drawings, specifications, nor claims contained material even suggestive of defendant's apparatus.

We must not lose sight of the fact that the prosecution of the applications for the patents in suit was from the beginning controlled by Vogt's attorneys, even after the assignment to Eskimo Pie Corporation and during all the time said corporation had any rights in and to them.

After the commencement of operations in May, 1929, of the defendant's redesigned Brooklyn plant, to wit, on August 3, 1929, a well-known trade magazine, "The Ice Cream Review," published an illustrated article describing defendant's plant; and, Vogt's original application having been divided into two applications, they were amended by cutting out large sections and inserting new material in the specifications different from, and at variance with, the original disclosure, and adding new claims calculated to read upon defendant's redesigned apparatus and process.

Subsequently the patents in suit were issued to plaintiff, and this suit was commenced.

All the claims in suit were added to Vogt's patent applications after defendant's apparatus became known to the public.

The amendments to patent No. 1,733,740, although dated August 19, 1929, were not filed until September 4, 1929, and amendments to patent No. 1,742,171 were dated November 22, 1929, and filed November 23, 1929.

The machine designed by Vogt and the patent application originally filed by him show clearly that he had no conception of the alleged infringing machine of the defendant.

Vogt was not attempting to design a machine in which the mix was to be gradually frozen, but one in which semifrozen ice cream mix was to be instantly frozen when spread upon cold rolls.

What he was attempting to accomplish was the instant freezing of the ice cream mix to a finished product, thus avoiding the necessity of using the usual refrigerated hardening room.

This is shown by the name chosen for the corporation formed by him, and to which the patent applications were assigned, "Vogt Instant Freezers, Inc.," and by the specifications of the patent applications for the apparatus No. 1,733,740, and for the process No. 1,742,-171, as they stood when the description of defendant's apparatus and process was published in the Ice Cream Review of August 3, 1929. The substantially identical disclosures of those applications teach that there were at least two methods of freezing ice cream: (1) Partially freezing the mix, pouring this partially frozen mix into molds, and putting the molds with their contents into a cold atmosphere wherein freezing was gradually completed; and (2) partially freezing the mix, and pouring it upon a very cold metallic surface wherein the freezing was very rapidly, almost instantaneously, completed, thus avoiding the necessity of putting the ice cream in a cold room.

Vogt's alleged contribution to the art was with reference to method (2) above described.

The device and process disclosed according to the original specifications were calculated to accelerate the freezing operation by

employing the idea of drawing through pipe 23, and pouring a thin film of semifrozen ice cream mix directly upon brine-chilled metal rolls 32 and 33, thereby freezing the mix to solidity almost instantly, as was stated in the specification: "Each of these rolls is cooled to a low degree of temperature, sufficient for causing the semi-frozen mixture which may come in contact with the surface thereof to be almost instantly frozen to solidity." The mix so frozen solidly upon the roll adhered to the surface thereof in its frozen state, and was carried around to the scrapers 60, which were calculated to remove the hard material in flakelike formation, which fell, completely frozen, to the conveyor belt 65.

The specification stated that the spacing of the rolls was such as to insure "complete solidification" of the layer of cream.

Any of the mix which did not freeze solid flooded down and formed a pool between the rolls, and no mix was conveyed by the rolls until after it froze solid on the surface of the rolls, as mix retaining any degree of fluidity would drop off.

Defendant's apparatus and process closely followed the old and customary method of manufacturing ice cream, as such method was described in the specifications of the patents in suit, as they stood on August 3, 1929.

Defendant mixes and otherwise prepares the fluid materials on the top floor of its plant, and they are there chilled and semi-frozen to a soupy consistency in the usual preliminary freezers. From the freezers the chilled mix flows down to a depositor on the floor below, which operates automatically to fill small molds, each of the size of the ice cream for Eskimo Pie, forming links of the conveyor belt which passes beneath the depositor. The belt, moving slowly, carries the filled molds into a cold tunnel or hardening chamber, 105 feet long, and the belt takes such a course that it travels about 300 feet in the tunnel, and each mold remains 45 minutes in the cold tunnel or chamber before reaching the exit. During this travel the contents of each mold gradually freezes because of exposure to the cold air in the tunnel or chamber.

It comes out of the tunnel or chamber to an ejecting apparatus where two operations occur: First, the mold is heated by a gas flame to soften the surface, and then the individual pieces of ice cream are blown out by compressed air and pass on through the subsequent steps necessary for making them into individual confections; and the belt and its empty molds pass through a hot water

and steam bath, and eventually reach the depositor again, at which time the molds are around room temperature, or even warmer.

The device and process of the defendant differed radically from those of the applications of the patents in suit, as they stood at the time of the publication of defendant's device and process on August 3, 1929, in that, unlike Vogt's device, the defendant employs no vacuum, no freezing surfaces, either in the form of refrigerated rolls or any other form, no scrapers, and no rotary screw packers.

Also, unlike the Vogt process, defendant does not freeze ice cream instantaneously; does not freeze ice cream on a cold surface; does not avoid the hardening chamber; and does not freeze the ice cream hard before moving it through the operating chamber.

What defendant does is to freeze the ice cream very gradually in a cold atmosphere, in the tunnel or hardening chamber 105 feet long, in which the molds of ice cream remain forty-five minutes.

The ice cream is frozen from soft to solid in the molds gradually as it advances through the cold tunnel or hardening chamber.

The molds in which the ice cream mix is deposited by defendant are not cold, but are of the room temperature, or warmer, having been steamed and washed with warm water before coming under the depositor.

The publication in the Ice Cream Review on August 3, 1929 of the details of the defendant's apparatus and process came to the attention of Vogt, in the middle of the month, about the 15th, as he admitted on the witness stand, and he said that he was so interested in what he found that he procured extra copies.

By an amendment dated August 19, 1929, and filed September 4, 1929, the apparatus patent, and by amendment dated November 22, 1929, and filed November 23, 1929, the process patent in suit, were amended so as to change the specification and to add with others the claims on which this suit is based, which in my opinion find no support in the invention, such as it was, that Vogt made.

Vogt's whole effort was directed to finding a way for instantly freezing ice cream and escaping from the use of the hardening chamber, and for that purpose he provided the rolls cooled with brine, but in the application, as amended, a new idea, at variance with the original disclosure, was expressed, in the assertion that the apparatus (or process) of the applications continuously "advanced the semi-frozen * * * material during

the hardening operation," passing it "through a chamber in which the same is hardened during its passage therethrough."

It is unnecessary to quote further from the amendments, as it is apparent that the effort was made by the amendments to claim a device and process contemplating the gradual freezing of semifrozen mix by exposure to cold air in a refrigerating chamber while passing the mix therethrough on a moving conveyer.

From all the evidence in this case, it clearly appears that no such invention was made by Vogt, and nothing was heard of it until after the details of the defendant's successful device and process were published to the world on August 3, 1929.

The three claims of the apparatus patent in suit are not based on the original disclosure, but upon the new matter imported into the case by the amendment aforesaid, and were added at the same time.

The reports or opinions of the respective attorneys (Defendant's Exhibit 4) are in no sense controlling, and the question they were considering was not exactly the same as in this suit, but I agree thoroughly with the part of the opinion of Vogt's attorneys in their report of October 17, 1927, in which, in differentiating between the earlier application which eventuated in the patents in suit and the later application, the spray machine, they said the "earlier invention had to do with discharging " * * mix onto refrigerated rolls and scraping the " * * frozen cream therefrom," and that "the only new part of the invention * * * comprises the freezing rolls and the associated mechanism which supplanted the hardening room."

The broadest claims in the original application were 19 and 21, in both of which is found the idea of instant freezing, as claim 19 required "delivering said mixture onto a freezing surface maintained at a low degree of temperature," and claim 21 required "spreading the same in a relatively thin film over a freezing surface, freezing said film into a substantially solid state."

In the defendant's machine there is no freezing surface.

No supplemental oath was filed with the amendments filed September 4, 1929, and November 23, 1929, respectively, as required by Revised Statutes, § 4892 (35 USCA § 35).

Neither the original specifications describe or the drawings show, nor do the original claims claim, the subject-matter of the claims now in suit, and the claims in suit are invalid for want of a supporting oath. George Cutter Co. v. Metropolitan Elec. Mfg. Co. (C. C. A.) 275 F. 158, 162; Simpson v. Newport News Shipbuilding & Dry Dock Co. (D. C.) 18 F.(2d) 318, affirmed (C. C. A.) 18 F.(2d) 325.

The patents in suit are mere paper patents. No such device as that disclosed in the patents ever went into commercial use.

Even the original model which Vogt called a test unit was dismantled, and parts of it with other parts, that were added, were used in building the spray machine which introduced spraying nozzles and substituted pressure for vacuum, and Vogt contended it was not covered by the patents in suit.

The patents in suit never made any impression on the art.

It seems to me to be unnecessary to go into the details as to the many reasons why the Vogt machine was incapable of producing ice cream that was commercially satisfactory. It is sufficient to say that it was incapable of producing ice cream with sufficient overrun.

This was not only shown by the testimony of other witnesses, but by the letters and action of Vogt at the time.

The testimony of Vogt that last year the plaintiff made an arrangement with the Borden Company and are jointly building the equipment to use the new primary freezer with the continuing hardening process, instead of sustaining the usefulness of the patents in suit, would go to show that the machine thereof could not successfully be used until a new primary freezer had been designed.

I have considered this question only because it seems to me that this action is an attempt to exact tribute from a successful machine to a mere paper patent of doubtful utility, and even then only on claims added by amendment after a full description of the defendant's process and machine had been published to the world.

As the objection to the usefulness of the patent dates back to the original application of which defendant was at one time the owner and the assignor to the plaintiff, I do not believe defendant can ask for a finding of invalidity on that ground.

The claims in suit, however, are new and broader than the claims at the time defendant assigned the application to plaintiff, and under these circumstances, even though defendant was the assignor, it may, not only

contest the scope of the claims added subsequent to the date of the assignment, in view of the prior art, but may also contest the validity of those claims. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co. (C. C. A.) 288 F. 330, certiorari denied 266 U..S. 342, 45 S. Ct. 117, 69 L. Ed. 316.

Piano Motors Corporation v. Motor Player Corporation (C. C. A.) 282 F. 435, cited by plaintiff, relates to the assignment of a patent, not an application, and is not in point.

Claim 9 of patent No. 1,733,740 is a typical claim of those in suit of the apparatus patent, and reads as follows: "9. In an apparatus for freezing ice cream or the like, the combination with a freezer for whipping air into the mix and freezing it to a semiplastic state, of means for hardening the same comprising a hardening chamber, means for delivering said mix in its semi-plastic state to said chamber, means for maintaining said chamber at a low degree of temperature, and means in said chamber for continuously advancing the mix through said chamber during the hardening operation."

Claim 10 of patent No. 1,742,171 is a typical claim of those in suit of the process patent, and reads as follows: "10. The process of freezing a substance of the character described, consisting in whipping air into a mix while partially freezing it to a semi-plastic state, delivering said mix in its semi-plastic state to a hardening chamber, and continuously advancing it therethrough while maintaining said chamber at a low degree of temperature whereby said mix will become frozen to a substantially hardened state while advancing therethrough."

Defendant offered in evidence twenty-seven prior art patents, and also drawings and descriptions of the Hydrox installation in Chicago.

An examination of the evidence clearly shows how narrow was the invention of Vogt and how closely the defendant follows the prior art.

There was nothing new in producing ice cream by first partially freezing the mix in a semiplastic state in a freezer designed to stir and aerate the mix, and then subject the aerated mix to a second freezing or hardening; on the contrary, it was common practice. Article in June, 1924, issue of the Ice Cream Trade Journal; article in August, 1925, issue of the Ice Cream Trade Journal; patents Nos. 899,925, 916,067, and 1,511,-644, to Valerius.

It was not new to freeze an ice cream mix upon a cold roll or cold rolls or cylinders. Patent No. 23,271 to Smith; 456,910, to Rube & Bartholomew; 475,817, to Sirrine; 491,104, to Hart; 532,987, to Ottino & Raffo; 944,625, to Milburn; 899,925, to Valerius; 916,067 to Valerius. In the last-mentioned patent, instead of rolls, disks are used.

It was not new to provide knives or scrapers to scrape frozen cream from a revolving roll. That was shown in each of the devices of the patents last above referred to.

There was nothing new in providing a belt conveyer or other conveyer to carry away the frozen cream after it had been scraped from the rolls. Patent No. 532,987 to Ottino & Raffo.

Both the patents No. 1,396,972, to Pfeiffer, and No. 532,987, to Ottino & Raffo, closely approximate the disclosure of the patents in suit, except that in patent No. 1,396,-972, to Pfeiffer, there is no prefreezing and the ice cream mix flows out of the spout 50 in Fig. 3 onto a continuous belt instead of onto rolls, and the belt is disposed in a refrigerated and insulated container or closet, and in the course of its travel across the closet is solidified. It eventually reaches the knife 6 shown on the underflight of the belt, whereupon it is scraped off and is deposited through a hopper into a container.

The novelty, if such there be, in the patents in suit, appears to be that, while most of the freezing machines of the prior patents contemplated the treatment of ice cream mix that had not been first run through a preliminary freezer, Vogt intended to use mix that had been run through a preliminary freezer. This appears in each of the apparatus claims in suit.

And even this is not new, as mix which had been preliminarily frozen was used by the Golden Rod plant from 1923, the Hendler Creamery Company from 1924, and by the Hydrox Company from 1925, prior to any date of invention that Vogt could claim, in the manufacture of ice cream.

I was not impressed by Vogt's efforts to attack applicability of the prior art; on the contrary, I am convinced that I have not misapplied the disclosures of such patents and publications.

Giving to the patents in suit the benefit of the presumption of validity, they cannot, in view of the prior art, be construed other than as narrowly covering the details of the apparatus disclosed in patent No. 1,733,740 and patent No. 1,742,171 as a process the

functions of that apparatus, and, however broadly they may be construed as to instant freezing, they cannot be read on or cover a machine or process in which a freezing surface, maintained at a low degree of temperature or a freezing surface, which will freeze into a substantially solid state, is not found. A broader construction would render them invalid.

Plaintiff contends that the patents are for a combination, and it matters not if all the elements are old if a new and useful result is obtained, in a new manner; but that does not aid the plaintiff because it is also true that there is no infringement if any important element of the combination is not found in the defendant's machine, as is hereinafter shown.

I find that important elements of the combination of the patents in suit are not found in the defendant's machine.

The "means for hardening the same," referring to the semifrozen mix, "means for delivering said mix in its semi-plastic state to said chamber," and "means in said chamber for continuously advancing the mix through said chamber during the hardening operation," which form important elements of each of the claims of patent No. 1,733,740, and in substance of the claims of patent No. 1,742,171 in suit, are the means described in the specifications and shown in the drawings of said patents, and the defendant does not use the means so described and shown.

In the upper part of the defendant's factory are located the conventional storage tanks, pasteurizer, measuring and weighing tanks, mixing apparatus, aging tank where mix is retained for twenty-four to forty-eight hours, and other facilities which prepare the ice cream mix for delivery to the usual preliminary freezer where the ice cream mix is frozen to a semisolid state, aerated, and given overrun. From the freezer the aerated and semifrozen mix is poured into a hopper from which a conduit leads to a depositor that operates automatically to fill the molds formed in the belt, which is an endless chain conveyer passing beneath the depositor.

This belt or conveyer comprises a number of links which are of metal and comprise a plurality of molds:

These molds are filled with ice cream mix by the depositor in an ordinary room of the factory, where the ordinary room temperature prevails.

The chain conveyer and the molds thereon are not chilled when filled, but are a little warmer than the room temperature, due to their having been washed in warm water and steamed.

As fast as the molds are filled they move forward into the hardening tunnel or chamber 105 feet long, where the air is kept at a very low temperature, approximately twenty-five to thirty degrees below zero, and the chain moves slowly so that each mold of ice cream traverses the length of the tunnel or chamber three times, traveling a distance of over three hundred feet before emerging, and is exposed to the cold air for forty-five minutes, which is sufficient to solidify the contents of the small molds, the capacity of each mold being about one ounce of ice cream, about two and a half to three inches long, one and a quarter inches wide, and half an inch thick.

The chain conveyer is not a freezing surface. It is merely a vehicle which carries the material to be frozen into the cold tunnel or chamber, where it is frozen by the cold air that surrounds it, and out of that chamber to the ejector mechanism which removes the ice cream from the molds. Thereafter the frozen ice cream proceeds to other devices for coating with chocolate, wrapping, etc., which we need not consider.

Following the ejection of the frozen ice cream from the molds and before again arriving beneath the depositor to commence a new operation, the chain conveyer with its empty molds passes through a hot water and steam bath.

The defendant's apparatus or method and Vogt's apparatus or method follow the same steps up to the preliminary freezer, but from then on there is a pronounced difference.

The defendant runs the material through a depositor which spreads it into individual molds. The individual molds are carried bodily through a tunnel or chamber about three hundred feet, and there frozen in an atmosphere of about twenty-five to thirty degrees below zero.

The ice cream becomes solid within the tunnel or chamber the same as it would in a can in a hardening room, and is removed from the mold in the same manner as ice cream is removed from a can.

In Vogt's apparatus the ice cream as it comes from the freezer is distributed upon freezing rolls, where there is instant freezing on the rolls. The layer of ice cream spread upon the rollers is thin and is not allowed to accumulate, but scrapers are provided to scrape it off, on a single rotation of the rolls of less than three hundred and sixty degrees.

The ice cream which is scraped off in a solidified state is carried by a belt to a chute, and run into a can by the use of a worm conveyer.

The defendant does no instant freezing of the ice cream; on the contrary, the ice cream mix is poured into molds around room temperature or warmer, and the freezing does not occur by contact, but, during the travel of over three hundred feet in the tunnel or chamber, freezing occurs by the very low temperature surrounding it.

The defendant employs no vacuum and no freezing or chilling surface, and has no freezing conveyer.

The defendant has no rollers, no scrapers, nor any other devices referred to in the patent in suit.

The difference as I view it is that the Vogt patents call for instant freezing and cannot be broadened to cover defendant's apparatus and method without rendering them invalid, whereas the defendant's apparatus and method are directly contrary in that the freezing is gradual.

The defendant's apparatus and method closely follow the prior art.

Compared with the apparatus and process used at the Hydrox plant in 1925, the defendant differs only in the capacity of the hopper and depositing machines, the Hydrox being for five gallons and the defendant's for one ounce of ice cream; that the Hydrox uses cans that rest upon a belt, and the defendant, instead of the can, uses flat molds extending across the belt, and that the time in the hardening room of the Hydrox is different from the time in the tunnel or hardening chamber of defendant, as it takes much longer to harden a five-gallon can than it does to harden a one ounce individual mold of ice cream.

The cans in the Hydrox plant are removed from the belt and allowed to stand in the hardening room, while the defendant's molds are kept moving while in the tunnel or hardening chamber, and that is the only novel feature of the defendant's installation over that of the Hydrox.

The Hydrox installation was in commercial use for about two years and was published to the world in the Ice Cream Trade Journal about one and a half years prior to any invention date claimed by Vogt, and it was old before any date of invention claimed by Vogt to chill or freeze articles (including ice cream) while continuously passing them through a cold chamber by means of a conveyer: Stollwerck patent, No. 277,804; Paris patent, No. 423,946; Becht patent, No.

537,522; Boyd patent, No. 1,138,929; Crouch patent, No. 1,308,753; Mathy patent, No. 1,385,636; Gripp & Pygeorge patent, No. 1,434,696; Hartshorn patent, No. 1,469,316; Davis patent, No. 1,509,591; Valerius patent, No. 1,511,644; Bennett patent, No. 1,528,043; Paley patent, No. 1,558,284; Schnaier patent, No. 1,624,679.

The defendant does not infringe.

I can find no support in the record for the defendant's contention that, even if the claims in suit were supported by a proper oath, and were infringed, they could not be equitably asserted against the defendant, and no authority is cited which holds that a party represented by counsel and fully advised can claim to have been overreached by an opinion of opposing counsel.

Furthermore, neither plaintiff nor defendant is estopped by the statements or so-called admissions of the attorneys for Vogt, the plaintiff, or the Eskimo Pie Corporation, contained in the opinions or reports. Defendant's Exhibit 4.

These reports or opinions were not admissions made by attorneys in the management of litigation, but in negotiating or bargaining, and such admissions or claims as were made therein were not admissions that may be used against the party client. Wigmore on Evidence (2d Edition) § 1063.

A decree may be entered in favor of the defendant dismissing the complaint with costs.

Submit findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by the rules of this court.